IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2014

**BLAKE DELANEY TALLANT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 89946      Mary Beth Leibowitz, Judge**

---

**No. E2013-01827-CCA-R3-PC - Filed July 15, 2014**

---

The petitioner, Blake Delaney Tallant, appeals the denial of his petition for post-conviction relief, arguing that he was denied the effective assistance of trial and appellate counsel due to counsel's failure to properly educate him on the importance of testifying in his own defense, to press the issue of the bill of particulars in the trial court or to raise it as an issue on direct appeal, and to include the jury questionnaires in the record on direct appeal. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Blake Delaney Tallant.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Steven C. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Knox County Criminal Court jury of two counts of first degree felony murder, one count of second degree murder, and two counts of aggravated child abuse, a Class A felony. The trial court dismissed the second degree murder conviction, merged the two felony murder convictions, and sentenced the petitioner to life plus twenty-five years in the Department of Correction. State v. Blake Delaney Tallant, No. E2006-02273-CCA-R3-CD, 2008 WL 115818, at *1 (Tenn. Crim. App. Jan. 14, 2008), perm.

app. denied (Tenn. June 30, 2008).

This court affirmed the convictions on direct appeal but remanded to the trial court with instructions to merge the two aggravated child abuse convictions and to hold a new sentencing hearing regarding consecutive sentencing. Our supreme court subsequently denied the petitioner's application for permission to appeal. See id.

Our direct appeal opinion reveals that the petitioner's convictions stemmed from the death of his three-and-a-half-month-old son, whose autopsy revealed at least twenty-five separate bone fractures in varying stages of healing, multiple bruises and scratches, and other injuries indicative of child abuse. Id. at *1-16. The first witnesses at the defendant's trial were the Knoxville police officers who responded to the petitioner's wife's 911 call that the victim was not breathing, police investigators who interviewed the petitioner that same night, and agents from the Tennessee Bureau of Investigation who conducted analyses of the petitioner's and the victim's blood and of the substance found in the petitioner's pocket on the night of the 911 call. According to the testimony of these various witnesses, the petitioner appeared "spacey" and nonchalant when the first officers arrived in response to the 911 call. The petitioner also appeared emotionless when later informed that the victim had died. A search of the petitioner uncovered methamphetamine in his pocket, and the petitioner's blood tested positive for methamphetamine and his urine positive for marijuana. The victim's blood also tested positive for methamphetamine. Id. at *1-3. Our direct appeal opinion contains the following summary of the other testimony at the petitioner's trial:

> Dr. Murray Marks, a forensic anthropologist with the University of Tennessee, testified that he examined both x-rays of the victim and bones from the victim's body to evaluate bone trauma suffered by the victim. Dr. Marks testified that his investigation revealed that the victim suffered nine antemortem fractures of his left-side ribs and nine antemortem fractures of his right-side ribs. Dr. Marks explained that antemortem fractures were those that featured bone calluses, which meant that the bone had healed and the fracture occurred prior to death. Dr. Marks said that the victim also suffered two perimortem fractures of his right-side ribs and three perimortem fractures of his left-side ribs, which included one rib being broken in two places. Dr. Marks explained that perimortem fractures were those that were "fresh" and had no signs of healing. Dr. Marks also noted that the victim suffered an antemortem fracture of his femur, or thigh bone. Dr. Marks noted that this break had a particularly large callus, which indicated that the bone "was broken and was never set." Dr. Marks also testified that the victim suffered an antemortem fracture of his right humerus, his upper arm bone.

-2-

On cross-examination, Dr. Marks testified that the bones of a child the victim's age tended to heal more quickly than those of an adult, which led him to conclude that the perimortem fractures occurred anywhere between the child's death and ten to fourteen days of his death. Dr. Marks said that he could not testify as to whether the victim's broken leg was a spiral fracture, and he also said that he had never heard of an instance where massaging a child's leg could lead to a spiral fracture. On redirect, Dr. Marks testified that although he stated that the victim's perimortem fractures could have occurred up to two weeks before his death, it was unlikely that the breaks were that old because the bones of a child the victim's age tended to heal quickly. Thus, the perimortem fractures were likely no more than ten days old.

Sarah Tallant, the [petitioner's] wife and the victim's mother, testified that she was originally indicted as a co-defendant in this case, but she reached a plea agreement with the Knox County District Attorney General's office. Pursuant this agreement, she agreed to testify against her husband; in exchange for her testimony, she would receive a twenty-year sentence with a release eligibility date of 30%.

Ms. Tallant testified that she met the [petitioner] in 1995 and married him in 1997. The couple originally lived in Arkansas before moving to Tennessee in March 1999. Ms. Tallant testified that she began using methamphetamine when she was eighteen and used the drug daily until she moved to Tennessee. She also said that the [petitioner] used drugs daily during the early part of their relationship and marriage. She testified that she and her husband moved to Tennessee in an attempt to create a "fresh start" and escape from the drugs. She testified that both she and her husband stayed off methamphetamine until their first son was born in June 2000. Shortly after their first son was born, both the [petitioner] and Ms. Tallant resumed using methamphetamine on a daily basis. Ms. Tallant testified that the couple's daily methamphetamine use continued until the victim died.

Ms. Tallant testified that when the couple first moved to Tennessee, both she and her husband held jobs. However, once the couple's first son was born, she quit work to focus on raising her son while the [petitioner] continued to work. Ms. Tallant testified that the [petitioner] worked eight to ten hours per day, five days a week, with an irrigation business. Ms. Tallant testified that her husband held this job for a "good while" but he had either quit or was laid off once the couple's second son, Arson, the victim in this case, was born on April 27, 2002. Ms. Tallant testified that the [petitioner], who was not

employed after the victim was born, took care of the child eighty to eighty-five percent of the time. Ms. Tallant explained that she and the [petitioner] agreed upon this arrangement because Ms. Tallant had been the primary caregiver for the couple's older son. Ms. Tallant testified that while the [petitioner] was the victim's primary caregiver, she did take the victim to the doctor's office for routine visits "about five times."

Ms. Tallant testified that her older son did not hurt the victim. She also said that the couple had two pit bulls, but that the dogs did not hurt the baby either. She testified that the victim was never left alone, and while one of the [petitioner's] cousins visited the house, this cousin never took care of the victim.

Ms. Tallant testified that the [petitioner], who she described as a "very hard person to read," did not like being watched. Ms. Tallant said that if she would watch him, the [petitioner] would ask her "why are you always watching me?" She also said that if the victim would cry, the [petitioner] "would always question me why I was always watching him and hovering over him."

Ms. Tallant recalled that the day the victim died, she spent most of the day at home with her two children while the [petitioner] was out retrieving a part for the couple's car. She testified that the victim seemed fine, though he seemed a little cold and did not eat much. Ms. Tallant recalled that around 6:00 that evening, the [petitioner] returned home. The [petitioner] asked her if she would be taking the dogs for a walk; she replied that she would not because she wanted to stay with her son, who was not feeling well. The [petitioner] insisted that she take the dogs out because she had promised the dogs that she would do so. At that point, Ms. Tallant said that she would walk the dogs. She left the family's residence around 7:30 p.m. and returned between 8:30 and 9:00 p.m.

Upon her return, Ms. Tallant noticed that the [petitioner] held the victim in his lap. Ms. Tallant told her husband that the baby looked blue and "kind of cold." The [petitioner] told her that he had just given the baby a bath and that the baby was fine, though the baby had not eaten when he tried to feed him. Ms. Tallant told the [petitioner] to refrain from feeding the victim if he did not want to eat, and she then took her oldest son into the bathroom and gave him a bath. She then took a bath herself, read to her oldest son for a while before putting him to bed, and then went to the living room. Ms. Tallant

-4-

noticed that the [petitioner] and the victim were in the couple's bedroom with the light off. She then went into the bedroom, where she noticed the [petitioner] lying on his back on the bed, with the victim lying on top of the [petitioner's] chest. According to Ms. Tallant, the victim looked "lifeless." She asked her husband if anything was wrong and noted that the victim did not appear to be breathing. The [petitioner] replied that everything was fine, and Ms. Tallant exited the bedroom.

A short time later, Ms. Tallant re-entered the bedroom and turned on the light. She looked at the victim, noticed that he "didn't look right to me," and then told her husband that she would call 911. Ms. Tallant said that the [petitioner], who was angry over this prospect, told her not to call 911 and said that he would divorce her if she did call. Ms. Tallant called 911 anyway. The tape of the 911 call was then played in open court. Although neither the recording nor a transcript of the call appears in the record, the trial transcript indicates that during the call, Ms. Tallant told the [petitioner], "I don't give a s--what you think. This is my son." Ms. Tallant testified that she told this to her husband because he was upset that she had called. She also testified that during the call, she told her husband that she was serious; she explained that she made this statement because the [petitioner] "laughs at everything. Everything is funny to him." During the call, Ms. Tallant testified that she told the police to hurry to the home. After hanging up, Ms. Tallant went through the house and attempted to hide some drugs that were in the house.

Ms. Tallant testified that she had seen the victim turn blue on one other occasion, when he fell when he was about one month old. Ms. Tallant explained that on this occasion, she returned home from taking her older son to the doctor when the [petitioner] told her that the victim fell. According to Ms. Tallant, the [petitioner] told her that he gave the victim a bottle, and the victim found the bottle to be too hot. At that point, the victim jumped, kicked, and fell from the couch to the floor, a distance of about one foot. Ms. Tallant testified that the floor onto which the victim fell was wooden, with a carpet covering part of it. Ms. Tallant testified that the side of her son's face was bruised, but several hours after she first noticed the bruising, it went away. Ms. Tallant said that neither she nor the [petitioner] took the victim to the doctor in connection with this incident.

Ms. Tallant testified that in the days immediately following this incident, the victim would cry whenever she attempted to pick him up. She then noticed that the victim's right arm was swollen at the elbow. Ms. Tallant

-5-

told her husband that the arm was swollen, and she wrapped the arm in a bandage. Ms. Tallant also testified that the [petitioner] kept the baby in a car seat for twenty-four consecutive hours so that the baby would not move his arm. Ms. Tallant testified that she did not know at the time that the victim's arm was broken.

Ms. Tallant testified that once, after the child received an inoculation in his left leg, she noticed that the leg was swollen. She then called the doctor's office and asked what to do. She testified that she was told to massage the leg, give the baby some baby Tylenol, and give him a warm bath. Ms. Tallant testified that she followed these instructions, but the baby's leg continued to swell. She also testified that when she massaged the leg, the victim would cry as if he were in pain. Ms. Tallant testified that she did not know at the time that the baby's leg was broken, and she also noted that the [petitioner] did not tell her anything about the baby's leg.

Ms. Tallant testified that shortly after the victim's arm became swollen, the [petitioner] attempted to "x-ray" the victim's arm by taking a lamp with a 500-watt bulb and holding it close to the baby's arm. The [petitioner] told his wife that while he held the lamp in one hand, he held a pillow over the baby's face to keep the light out of his eyes. Ms. Tallant said that the [petitioner] told him that the pillow slipped, and when the baby attempted to grab it, the lamp somehow came into contact with the baby, burning him on his right arm and stomach. After the incident, the baby's parents decided that when they took the child in for his next check-up, they would tell the doctor that the baby had suffered the burns when the lamp was accidentally knocked over and fell on the baby. Ms. Tallant said that at the time she learned about the burns, she believed that they had been accidentally inflicted.

Ms. Tallant acknowledged that some of the scratches that were seen under the victim's chin upon his death probably resulted from when the [petitioner] would hold the victim's mouth shut so that the victim would stop crying. Ms. Tallant said that she saw the [petitioner] hold the baby's mouth shut a couple times. She also recalled that the [petitioner] would toss the victim into the air in a playful manner. Ms. Tallant did not recall whether the [petitioner] did this before or after she noticed the baby's leg had become swollen. She also recalled seeing the [petitioner] throw the victim onto a beanbag chair on two occasions. Ms. Tallant also testified that on one occasion, the [petitioner] placed a wet paper towel into the baby's mouth in an attempt to silence him.

Ms. Tallant said that on some occasions, the [petitioner] would sit the baby on his (the [petitioner's]) knees and bounce the child up and down in an attempt to burp him. Ms. Tallant recalled that when the [petitioner] did so, the baby's head would "kind of dangle because he was only a couple of months old. He didn't have enough strength to hold his own head up." She also testified that about one week before the baby died, she noticed an area of redness on the baby's bottom. Ms. Tallant asked the [petitioner] what was wrong, and the [petitioner] replied that he had put baby powder on the child's bottom, which led to a rash. Ms. Tallant testified that she did nothing to that part of the child's body to hurt it. She said that when she took the baby's temperature, she did not use a rectal thermometer.

Ms. Tallant testified that approximately one week before the victim died, she and the [petitioner] drove to Sweetwater, Tennessee, with their two children to visit a friend. After arriving at the friend's house, the friend informed Ms. Tallant that the baby had quit breathing. Ms. Tallant gave the baby to the [petitioner], who then blew into the baby's mouth. According Ms. Tallant, this action "brought [the baby] back." Ms. Tallant testified that neither she nor the [petitioner] sought medical attention for the child after this incident because the [petitioner] told her that the baby would be okay. Ms. Tallant testified that after the family returned to Knoxville, the [petitioner] then went back to Sweetwater, where he spent to two three days making methamphetamine.

Ms. Tallant testified that she was aware that methamphetamine was found in the baby's system at his death. She testified that she took methamphetamine while she was pregnant with the victim, but that she never put methamphetamine in the baby's bottle. She also said she never put the drug up the baby's nose or injected the drug into the baby's body.

On cross-examination, Ms. Tallant testified that the day after the victim died, she gave a statement to police in which she said that neither she nor the [petitioner] had done anything to hurt their child. Ms. Tallant stated that upon returning to her home after giving that statement, investigators from the Department of Children's Services (DCS) arrived at the home and took the couple's older child into state custody. After the DCS visit, Ms. Tallant gave a second statement to police, in which she again stated that neither she nor the [petitioner] had done anything to hurt the victim. At the conclusion of this second statement, Ms. Tallant and Detective Slagle, who took the statement, got into an argument, which led the police to place Ms. Tallant into a police

interrogation room. According to the statement, parts of which were read into evidence, the police placed the [petitioner] and Ms. Tallant under arrest for first degree murder at that point, but Ms. Tallant testified that she did not recall being informed that she was under arrest. What Ms. Tallant did recall was that after being placed in the interrogation room, she gave another statement to another police investigator, Wallace Armstrong, in which she implicated her husband in the baby's death. Ms. Tallant testified that this statement was a coerced statement which she made in an attempt to regain custody of her older son. While she stated that this statement was coerced, she claimed that the statement, like the ones she had given earlier, was true. Ms. Tallant testified that at the time she gave her third statement, "I knew all of this stuff was going on, but I didn't think it consisted of death, to me, at the time." Ms. Tallant said that after giving this third statement to police, she was taken into custody, where she remained at the time of this trial.

Ms. Tallant testified that she retained separate counsel, one who was not an employee of the Public Defender's office. She recalled that she, the [petitioner], and counsel for both parties met monthly from August 2002 to October 2004. During one of these meetings, the parties discussed Ms. Tallant's statements to police. At that time, she told her husband and the involved attorneys that her statements to police were either lies or grossly exaggerated. At trial, Ms. Tallant testified that she did exaggerate some of her statements to police. However,

> At the time that all this stuff had happened, I didn't think that it was--the way I told the cops was different--I put a different spin on it, as to when I was at home and all this stuff happened. Like on my statement, it sounded mean and evil, and [the petitioner] did this . . . [the petitioner] did that. But at home, I was not thinking that. I was thinking that everything was fine. Even though a lot of things happened, I still thought that everything was fine. But when I got to the police station, I made it sound like I didn't like none of the things he was doing at the time.

Ms. Tallant stated that she made her statements in the manner she did because the police "had told me I wasn't going home if I didn't blame it on the [petitioner]. So I wanted to make it possible that I was going to go home."

-8-

During cross-examination, Ms. Tallant admitted that several particular parts of her statement to police were untruthful. She said that her statement to police that the [petitioner] had hit her frequently was a lie. Ms. Tallant said that the [petitioner] never hit her during their marriage. She also admitted that her statement that the [petitioner] would place the baby in a car seat and shake it violently was a lie. Ms. Tallant admitted that the [petitioner] placed the baby in a car seat only once, when the [petitioner] was attempting to keep the baby from moving his injured arm. Ms. Tallant also admitted that she put the baby in a car seat for brief periods while she was performing household chores. Ms. Tallant also said that her statement that the baby would scream whenever the [petitioner] came close to him was a lie. Finally, she admitted that her statement to police that the [petitioner] kept her from seeing the baby was a lie. She testified that the [petitioner] was the baby's primary caretaker, but that arrangement had been agreed upon by both parents.

Ms. Tallant also identified certain parts of her statements to police that had been exaggerated. She said that her statement to police that the [petitioner] would throw the baby into the air was an exaggeration. Rather, the [petitioner] would hold the baby in the air and then drop his hands about six inches. During that time, the [petitioner] would never lose contact with the baby. Also, she admitted that her statement that the [petitioner] would throw the baby into a beanbag chair was an exaggeration. Rather, the [petitioner] would drop the baby onto the chair from a few inches above the chair.

On several occasions during cross-examination, Ms. Tallant said that she never saw the [petitioner] do anything to intentionally hurt the victim. Regarding the scratches under the baby's chin, she noted that she saw them during the three months the baby was alive, though she could not recall the exact date on which she saw them. She also recalled seeing the [petitioner] holding the baby's mouth shut, but she did not recall the exact dates on which the [petitioner] did this. Ms. Tallant admitted that in her meetings with the [petitioner] and counsel, she had said that the first time she saw the scratches was the day the victim died.

Ms. Tallant testified that she had no idea how methamphetamine was introduced into her son's system. Regarding her own drug use, she said that she used methamphetamine every day during her pregnancy, and that her methamphetamine use increased after the victim was born. She also said that she smoked marijuana during her pregnancy, and that she smoked cigarettes until her fifth or sixth month of pregnancy. Ms. Tallant admitted that she used

methamphetamine when she woke up each morning and took a smaller amount in the afternoon. She stated that she did not always wash her hands after using. She also stated that she had previously told the [petitioner] and counsel that she prepared all of the baby's formula bottles.

Ms. Tallant admitted that from August 2002 to October 2004, she frequently wrote letters to her husband. She stated that in those letters, she told her husband that she believed he was innocent, and she told the [petitioner] that she had implicated him in the victim's death so that she could be set free. Ms. Tallant stated that at the time she wrote the letters, she did not believe that her husband did anything to intentionally hurt the victim, and that she still felt the same way at trial.

Ms. Tallant testified that in October 2004, she gave a "statement" to the District Attorney General. Defense counsel asked Ms. Tallant several questions about this statement, actually a deposition, to assess the deposition's validity. Ms. Tallant said that in her deposition, she told the district attorney that she did not know that the victim had suffered any broken bones and had no explanation as to how the victim could have suffered those injuries. She stated that this statement was consisted with her testimony at trial. She also told the district attorney that she was unaware that the child had pneumonia, and that she did not see any evidence of injury to the victim's rectum. She also recalled telling the district attorney that she had never seen a bruise on the child's body except shortly after the [petitioner] told her that the baby had fallen from the sofa. She also noted that she told the district attorney that the only external injuries that she had ever seen on the victim were this bruise and the burns to the baby's stomach and hand.

Ms. Tallant testified that the evening her son died, she may have returned home at 8:15, rather than 8:30 or 9:00 as indicated on direct examination. She admitted that if she did arrive home at 8:15 and the 911 call was not made until 10:40, some two hours passed between her returning home and calling 911. She stated that she "knew" her husband was under the influence of some drug when she returned home, yet she believed her husband when he said that the victim was fine. She said that she believed her husband because when their older son was younger, she was "always" thinking something was wrong with the boy, and the [petitioner], despite being "high" believed that the boy was okay, and the [petitioner] turned out to be right.

Ms. Tallant testified that during her meetings with the [petitioner] and

-10-

counsel, she had said that her husband left for Sweetwater to make methamphetamine on the Thursday before the victim died. She said that the [petitioner] remained gone until Monday or Tuesday, and that he was gone most of the day on Wednesday, the day the victim died. At trial, though, Ms. Tallant said that the [petitioner] did not go to Sweetwater by himself until the Saturday or Sunday before the victim died, and that he returned on Monday, two days before the victim died.

Ms. Tallant testified that she changed the victim's diaper several times a day, and in the course of changing the diaper, she never saw any trauma to the child's rectum. She also testified that she never saw any cuts to the victim's groin, though she did notice that the baby had diaper rash. Regarding the broken bones, Ms. Tallant admitted that during her previous meetings with the [petitioner] and counsel, she had stated that she believed that the victim's ribs, arm, and leg were broken in June 2002, when the baby fell. When asked if she still believed this to be true, Ms. Tallant replied, "I guess. Yeah. I don't know if it's true or not."

On redirect, Ms. Tallant said that the police did not tell her to lie to them in an attempt to implicate the [petitioner]. She also testified that her deposition in connection with this case was truthful, and that she was being truthful in her testimony at trial. She also reiterated that her husband did not have regular employment during the victim's life. Ms. Tallant said that the [petitioner] "might have worked one day or a couple of days with a friend of his . . . [installing] central heat and air, but he didn't have a job."

On recross, Ms. Tallant admitted that in addition to massaging the victim's swollen leg, she did some "bicycle type" exercises with the leg in an attempt to ease the pain in the baby's leg and lessen swelling. The court then had the witness answer questions from the jury. When asked why she was "not as protective" of the victim as she had been of her older son, Ms. Tallant replied that she had frequently thought something was wrong with her older son when in fact the child was fine.

Dr. Darinka Mileusnic-Polchan, a forensic pathologist, testified that she performed the autopsy on the victim, who was three and a half months old at his death. Dr. Mileusnic-Polchan first testified as to the thirty-one external injuries she noted on the victim. The first three injuries she noted were on the left side of the baby's face. She identified abrasions on the victim's left lower eyelid, as well as abrasions on the outer corner of the victim's left eye. She

-11-

also noted a bruise on the victim's nasolabial groove, which she identified as the fold of skin between the nostril and the outer corner of the mouth. Dr. Mileusnic-Polchan testified that each injury, by itself, would not be cause for concern, but the injuries taken together did concern her.

The first injury that particularly concerned Dr. Mileusnic-Polchan was a group of ten "irregular abrasions" under the victim's chin. She noted that the injuries were in "different stages of healing, meaning some [were] fresh, some [were] old." Some of the abrasions were deeper than others, with some of the injuries reaching down to the subcutaneous tissue. Dr. Mileusnic-Polchan noted that there was also bruising around the abrasions. Dr. Mileusnic-Polchan opined that "10 of them in this area, with a lot of bruising, this is . . . a red flag. This is very, very concerning." She also stated that an injury in this area should "never happen. This is something that you don't inflict upon a baby with the regular care and not even with regular roughhousing. This is something that is inflicted . . . . it's evidence of foul play in addition to some other evidence of injury."

Dr. Mileusnic-Polchan then noted the external injuries present on the back of the victim's head. She noted bulging in the fontanelle, which is the membrane connecting the bones of the scalp before the bones ossify and fuse together. She noted that this injury by itself was insignificant and was not truly an injury, but rather was indicative of swelling within the brain. She also noted a 0.4 inch abrasion on the back of the victim's head, near the top of the head. Dr. Mileusnic-Polchan noted that the injury by itself was not concerning, as this type of injury was often sustained during resuscitation efforts, but the injury was concerning in light of the other injuries.

Dr. Mileusnic-Polchan testified that the victim suffered "multiple horizontal irregular stretch abrasions" on his neck. She noted that babies often have some form of skin irritation in this area, as milk or other liquid can become lodged in skin folds, but these abrasions were not indicative of this activity. Rather, Dr. Mileusnic-Polchan noted that these abrasions were indicative of the skin being stretched "suddenly and extensively," and that these injuries were often common in motor vehicle accidents. Dr. Mileusnic-Polchan also noted the presence of a 0.7 inch abrasion on the left side of the victim's neck. Like many of the other injuries, she noted that this injury by itself was insignificant but worrisome in light of the other injuries.

Dr. Mileusnic-Polchan noted that the victim experienced tearing in both

-12-

frenula, the membranes connecting his lips to his gums. She noted that these injuries constituted "child abuse until proven otherwise." She noted that this injury is not caused by regular resuscitation. Rather, the injury is caused by something being "forcefully pushed in the baby's mouth, frequently a bottle, forceful feeding or some sort of other object." Dr. Mileusnic-Polchan testified that these injuries were showing signs of healing, meaning that the victim had suffered them several days before he died.

Dr. Mileusnic-Polchan noted several abrasions and areas of abrasions and discoloration on the victim's chest and abdomen. Like many of the injuries, she noted that each of these injuries by itself was "meaningless," but "[t]aken together, they're very, very worrisome. The babies that age don't present with so many injuries in that area. And now taking into account the head and neck region, that's extremely, extremely troublesome."

Dr. Mileusnic-Polchan then testified regarding the injuries on back side of the victim's body. She noted that the victim had a 0.3 inch abrasion on the back of his neck. She opined that the injury had been there about a week. She then identified a "U-shaped" injury on the victim's back, consisting of two parallel abrasions, one 0.6 inches in length and the other 1.1 inches long. She also identified bruising around the abrasion. Dr. Mileusnic-Polchan testified that this injury was "really well-defined . . . meaning that some sort of object that was shaped, U-shaped or maybe square-shaped" came into contact with the victim's back. As to the cause of the injury, Dr. Mileusnic-Polchan testified that "[e]ither the baby was hit with something or was thrown on the ground that had some U-shaped object on the ground." Dr. Mileusnic-Polchan said that she could not identify the exact cause of the injury, but noted that it was indicative of blunt-force trauma.

Dr. Mileusnic-Polchan noted that the victim had a 0.2 inch abrasion on his left buttock. She also identified an area of abrasions, bruising, and skin tears near the child's anus. Dr. Mileusnic-Polchan noted that some of the skin tears were deep, reaching to the subcutaneous tissue. She also noted the presence of a hematoma. Dr. Mileusnic-Polchan examined skin samples from the anal area under a microscope; when she did so, she noted "extensive" hemorrhaging but little accompanying inflammatory reaction. Dr. Mileusnic-Polchan testified that this meant that the injury occurred within a day of the victim's death. Dr. Mileusnic-Polchan opined that these injuries were caused by blunt-force trauma, though she could not identify what object actually caused the injury.

-13-

Dr. Mileusnic-Polchan testified that the victim had some evidence of diaper rash. She also noted a series of abrasions in [his] groin. Some of these abrasions were of the "normal" variety, while some were stretch abrasions similar to the ones that were evident on the victim's neck. Dr. Mileusnic-Polchan noted that this type of abrasion could only be caused by "the forceful acceleration/deceleration of injury and bending of the skin." She noted that it was unusual to discover this kind of injury except in child abuse cases and motor vehicle accidents.

Dr. Mileusnic-Polchan noted bruising on each of the victim's elbows. She noted that these injuries were troubling because "[t]he elbows are very rare areas for a baby that age to be injured. They're not mobile. They don't move by themselves, and to fall on the elbow or explain elbow region by accident, that's really extremely rare, even if possible."

Dr. Mileusnic-Polchan noted that the child's left thigh was "very swollen, very deformed," and the bruising around the thigh was evident of a "combination of recent and old injury." She later noted that her internal exam of the area surrounding the leg produced "evidence of hemorrhage, fresh and healing, meaning that the leg was reinjured" and that the "additional injury could have [occurred] . . . nonintentionally as opposed to the injury that caused it originally." She also identified two burns, one on the child's abdomen, and the other on the victim's right hand.

Dr. Mileusnic-Polchan then testified regarding the child's internal injuries. She first identified several broken ribs, some which had healed, and others which had not. Regarding the level of pain accompanying these injuries, Dr. Mileusnic-Polchan testified that bone fractures are among "the most painful pediatric emergencies."

She also identified an area of hemorrhaging and abscess formation on the left side of the victim's chest. Dr. Mileusnic-Polchan noted that "some of those [rib] fractures . . . injured surrounding vessels and muscle [and] induced or produced abscess, meaning infection, meaning pus collection." Dr. Mileusnic-Polchan noted that her microscopic review of these chest injuries led her to conclude that the injuries occurred within a day of the victim's death.

Dr. Mileusnic-Polchan noted that the victim suffered a deep intramuscular hemorrhage in his left upper back. Dr. Mileusnic-Polchan

-14-

performed a microscopic exam of this hemorrhage, during which she found evidence of "recent hemorrhage with no surrounding inflammatory reaction, suggesting a very recent" injury. She testified that some of the back injuries occurred within a day of the victim's death. Dr. Mileusnic-Polchan also noted that the victim suffered hemorrhaging in his diaphragm. After performing a microscopic review of this injury, Dr. Mileusnic-Polchan concluded that these injuries had occurred three to five days before the victim died.

She also noted a "rusty brown discoloration" around the spinal cord, indicating a hemorrhage that had occurred five to seven days before the victim died. Dr. Mileusnic-Polchan noted that the victim's brain was significantly swollen, which led to hemorrhages in the fontanelle outlined above.

Dr. Mileusnic-Polchan testified that when she examined the victim's lungs, she discovered that the child had been suffering from "infection of the lungs . . . pneumonia, and also pleurities or infection inside the chest cavity." Regarding the infection to the child's lungs, she noted:

> His right lung was completely obliterated with infectious process, and there was no left alveolar space or any area of the lung that he would actually use--could use for breathing, and the--in the left lung, the infection was a slightly lesser degree, but still there was presence of . . . developing infection. . . . [There was] also even focal abscess formation in the lung tissue itself. So the ultimate mechanism of [the victim's] death would be severe pneumonia, inability to breath[e]. However, this pneumonia was brought on by his extensive injuries, particularly the rib fractures.

When asked if these injuries were accidental, Dr. Mileusnic-Polchan noted:

> There was no way that some of the injuries would ever be an accident in a baby three and a half months old, and the multiplicity, the distribution, and severity of some of the injuries completely takes it out of [the] realm of any sort of accident and makes it a homicide and child abuse.

On cross-examination, Dr. Mileusnic-Polchan testified that the injuries under the victim's chin were likely caused by a fingernail. She also testified

that she had no way of knowing the exact manner in which the methamphetamine found in the victim's system was ingested, but that it could have been ingested through a formula bottle administered close to the victim's death. Dr. Mileusnic-Polchan also reiterated that some of the external injuries occurred within a day of the victim's death, but some occurred between five and seven days before the victim died.

The [petitioner] presented several witnesses from the Knox County Health Department who interacted with the victim and his parents to varying degrees. Two registered nurses, Joyce McGinley, and Sarah Croley, each testified that they met with the victim once, with McGinley meeting with the victim and both parents on June 10, 2002, and Croley meeting with the victim and his mother on July 31, 2002. Each nurse testified that her meeting consisted of talked to the baby's parent or parents about the victim's general progress. McGinley did not recall whether she physically examined the victim, but she noted that administering physical exams was generally not in her job description. She noted that based on her review of the "crib card" that had been compiled at the time of the child's birth, the victim's health and growth appeared to be normal. Croley testified that the victim did not appear to be in any distress during her meeting with the victim and his mother, but that she did not physically examine the child during the meeting.

Two Women, Infants and Children (WIC) program nutrition educators with the Knox County Health Department, Nina Garton and Autumn McElhaney, testified that they each met the victim once--Garton met with the victim and both parents in either May or June 2002, and McElhaney met with the victim and his mother on July 31, 2002. Both nutrition educators testified that during these meetings, the nutrition educator had general discussions regarding the baby's health with the parent or parents present. Both Garton and McElhaney testified that their notes from these meetings indicated no abnormalities or signs of distress regarding the victim, but both women testified that they had little recollection concerning their visits with the victim.

Karen Goodrick, a nurse practitioner, testified that she was employed by the Knox County Health Department when Sarah Tallant brought the child in for three well-child exams between May and July 2002. During the examinations, Goodrick did not notice any problems with the victim that would have suggested that he was being physically abused. She said that the child did not experience any distressed breathing and did not appear to be in pain during the visits. During the last exam, which took place on July 10,

Goodrick performed a test on the victim's legs to check his hip placement. The test involved pushing the child's legs up, out, and back, and although Goodrick said that this exam was "relatively stressful" for most children, the victim did not encounter any pain during the test. Goodrick testified that Sarah Tallant explained that the burns the victim suffered occurred when the [petitioner] (who was not present at any of these three exams) and the victim's older brother were playing on the floor and knocked over a lamp, which fell on the victim. Goodrick said that this answer seemed satisfactory at the time and did not cause her concern. On cross-examination, Goodrick testified that she had seen the autopsy photographs, and during her examinations of the victim, she did not notice any of the external injuries evident in the photographs. She also admitted that she did not see the victim between his July 10 visit and his death on August 14.

Kathi Zechman, a licensed practical nurse, testified that she gave the victim two rounds of immunizations during two visits to the Knox County Health Department. On May 8, 2002, she administered a hepatitis B shot in the victim's thigh, and on July 10, 2002, she gave the child two shots in his left leg and two shots in the right leg. Zechman testified that she did not notice any swelling in the baby's legs during the visit, and other than a burn on the baby's hand, which she discussed with Goodrick, she noticed no physical problems with the child. Zechman testified that her administration of the immunizations could not have caused the broken leg suffered by the victim, nor could she have caused the rib fractures the victim suffered. She also noted that if the baby were crying or "particularly fussy," she would not have made a note of it.

Jason Turnblazer testified that between April and August 2002, he employed the [petitioner] at his irrigation and landscape lighting business. Turnblazer insisted that although he had no employment or payroll records regarding his now-defunct business, the [petitioner] attended work every day and was a good employee. On cross-examination, Turnblazer admitted that he mainly kept in contact with the foreman on each jobsite, rather than the individual employees. Turnblazer also admitted that he did not recall the [petitioner] informing him about the victim's birth, and that he heard about the victim's death through media reports. Turnblazer also testified that the [petitioner] was no longer working for him when he learned that the victim had died.

Glenn "Sonny" Gish, the [petitioner's] stepfather, testified that he interacted with the victim only once, during a two-day visit to the Tallant home in July 2002. Gish testified that during the two days he and his wife visited with the victim, his parents, and the victim's older brother, he noticed no problems with the victim. Gish testified that the victim did not appear to be in pain during the visit. Gish testified that he saw burns on the victim's hands and stomach, and when he asked the [petitioner] and his wife about the burns, they told him that the [petitioner] and his older son had been playing on the floor when they knocked over a lamp, which fell on the victim. Gish testified that this explanation did not distress him. On cross-examination, Gish testified that the victim's burns were bandaged and he did not see the victim's skin underneath the bandages. Gish also testified that the house was clean and he did not see anyone in the house using drugs, but admitted that because he did not use drugs, he would not have known whether the [petitioner] or his wife were using drugs if in fact they were.

Bettye Tallant, the [petitioner's] mother and Sonny Gish's wife, testified that she visited the [petitioner], his wife, and their children in July 2002. Like her husband, she also testified that there were no noticeable problems concerning the victim during her visit. She said that the victim did not cry any more than a normal child his age. Ms. Tallant did testify that one of the victim's arms appeared slightly swollen during the visit, and after she saw the [petitioner] pull the child up by that arm, she told the [petitioner] not to pull the child up by his arm, because the [petitioner] may pull the arm out of its socket. Ms. Tallant testified that she did not seem too concerned by the child's swollen arm or the [petitioner's] pulling the child's arm. On cross-examination, Ms. Tallant admitted that she was not aware that the [petitioner] and his wife were regular methamphetamine users.

Id. at *3-15.

On September 3, 2008, the petitioner filed a *pro se* petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of trial and appellate counsel. Among other things, he alleged that counsel was ineffective on appeal for failing to include jury questionnaires in the record on direct appeal, which limited this court's review of whether the trial court erred in seating three jurors at his trial. Following the appointment of post-conviction counsel, he filed an amended petition on June 13, 2013, in which he alleged that counsel was ineffective at trial and on appeal for not allowing him to testify in his own behalf, failing to present alternative theories relating to the victim's injuries, failing to retain expert assistance in determining the date and causation of the victim's injuries, and

-18-

for not raising as an issue on appeal the trial court's denial of their motion for a bill of particulars. On appeal, however, the petitioner confines himself to arguing that counsel was ineffective for not properly advising him on the importance of testifying, for not "pressing the matter" of the bill of particulars in the trial court or raising the issue on direct appeal, and for not including the jury questionnaires in the record on direct appeal. We will, thus, confine our summary of the evidentiary hearing to testimony that is relevant to those issues.

At the evidentiary hearing, the petitioner testified that he told all four of the attorneys who were, at one time, on his defense team that he wanted to testify. He said that one of the junior counsel told him that he would start preparing his testimony about three weeks before the start of the trial, but he never did because he ran for judicial office a few months before the petitioner's trial. In the meantime, senior counsel kept trying "to manipulate [the petitioner]" into saying that he did not want to testify. According to the petitioner, senior counsel, reminding him of his history of manufacturing methamphetamine, told him that he would be "hangin[g] [himself]" if he testified. He acknowledged that the trial court reviewed his rights with him at the trial. He insisted, however, that the only reason he told the trial court that he did not want to testify was because he had been manipulated by senior counsel.

The petitioner testified that the trial court denied counsel's request for a bill of particulars. Although he had not understood its importance at that time, he had since researched the issue and believed that it would have greatly helped his case for the State to have been required "to categorize all the injuries to dates and times." He explained that he believed that, with a bill of particulars, defense counsel could have separated the victim's various injuries into those that occurred on the date of his death and those that occurred when the petitioner was not present in the home. He said that counsel did not include the trial court's denial of the bill of particulars as an issue on direct appeal.

The petitioner testified that senior counsel raised an issue on direct appeal about the seating of three jurors, but did not include the jury questionnaires in the record, which resulted in the Court of Criminal Appeals stating in its direct appeal opinion that it was unable to fully review the issue.

On cross-examination, the petitioner acknowledged that his defense team had weekly meetings with him at the jail. He further acknowledged that his counsel argued on more than one occasion for the bill of particulars but that the trial court ultimately ruled in favor of the State. On redirect, he said that, had he testified at trial, he would have been able to explain that he was away from home from the Friday through the Monday night prior to the victim's death.

Senior trial counsel, the District Public Defender for Sixth Judicial District, testified that he had been licensed to practice law for thirty-three years and had been the public defender for the past twenty-three years. His office began representing the petitioner in 2002, with the case culminating in the petitioner's trial in April 2006. At the beginning there was some talk about the State filing a death notice, so the Administrative Office of the Courts allowed him to associate an outside counsel. In addition, two of the attorneys in his office also worked on the case. Although each of those other three lawyers left over time, there were four lawyers working on the petitioner's defense team "for the most part." Other people on the defense team included an investigator, a mitigation specialist, and "an administrative person." Senior trial counsel testified that he and his team met weekly with the petitioner at the jail, holding over 70 joint defense meetings with Ms. Tallant and her defense team and approximately 120 separate meetings with the petitioner alone. He explored several defense options, including the possibility that the victim suffered from osteogenesis imperfecta, or "brittle bone" disease. To that end, he consulted with an expert in the field and obtained permission from the court to have the victim's blood sent to Tulane for genetic testing, the results of which were that the victim did not suffer from that disease. Counsel testified that he also obtained permission and funding to hire an expert in pediatric forensic pathology, who reviewed the findings of the State's medical experts and agreed with their conclusions that the victim's injuries were indicative of child abuse.

Senior trial counsel testified that he had "multiple conversations" with the petitioner about whether he would testify. He said the petitioner believed that counsel could simply "stand up and tell the jury" his version of events without the petitioner's taking the stand and expressed great frustration when he explained that was not the way it worked. Counsel stated that as their representation was ongoing, the petitioner "was giving [them] indications that he was not going to testify." He stated there were things that Ms. Tallant said that the petitioner wanted to tell the jury were not accurate, but the petitioner also described the thought of testifying as "a scary thing." Counsel stated that he told the petitioner that the district attorney would likely cross-examine him about each of the victim's injuries, which would mean that the petitioner would have "to take one of three positions generally: (a) I did it and it was an accident; (b) I didn't do it; I don't know who did; and I never noticed the injuries to my child; or (3 [sic]) I didn't do it; I noticed it; but I didn't do anything about it." According to his notes, he talked to the petitioner again about testifying on March 23, 2006, asking if he wanted to reconsider his decision. The petitioner, however, confirmed that he did not want to testify. Counsel said he made it clear that the decision was the petitioner's alone. The petitioner was adamant about his decision, telling counsel at one point, according to counsel's notes, "Make no doubt about it; I ain't testifyin'."

Senior trial counsel testified that the defense theory they developed involved attempting to convince the jury that the State could not show that the petitioner was either

responsible for the victim's first two "clusters" of injuries, or negligent for not noticing them, given that a trained nurse who saw the victim after the date of those injuries also failed to notice them. As for the third cluster of injuries, they attempted to show that the petitioner was not present for most of the time frame in which those injuries occurred. The jury, however, rejected their theory.

On cross-examination, senior trial counsel testified that he could not recall the petitioner's level of education or IQ but that he was "smarter than most clients," always asked questions, did a lot of independent research, and "was engaged." He said he never thought the petitioner's testimony would be helpful to his case. He did not recall having discussions with the petitioner in which he recommended that he either testify or not testify because the petitioner "was driving that train" and "knew what he wanted to do." Instead, he challenged him by inquiring whether he was sure not testifying was what he wanted to do. He also had "lots of discussions" with the petitioner about what he would say if he decided to testify and how his testimony would open the door for the State to inquire into "a lot of other stuff."

Senior trial counsel testified that they filed and argued for the bill of particulars but were denied by the trial court. He said he did not recall whether they raised the denial of the bill of particulars as an issue on direct appeal and said that, if they did not, he could not say why. However, he thought they were successful in categorizing the victim's injuries into three separate "clusters" that occurred over three different time frames.

Senior trial counsel testified that the trial judge "was extremely possessive" of the jury questionnaires, which he kept in his office and required counsel to turn back in after the jury was selected. He conceded, however, that it was "an error on [his] part" not to make the questionnaires part of the record on appeal.

On July 24, 2013, the post-conviction court entered an order denying the petition for post-conviction relief. Among other things, the court found that the petitioner did not demonstrate either deficiency or prejudice with respect to his allegation that counsel was ineffective at trial for failing to allow him to testify in his own behalf and did not demonstrate prejudice with respect to his allegations that counsel was ineffective on appeal for failing to raise the denial of the bill of particulars as an issue and for not including the jury questionnaires in the record. Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is

held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues on appeal that counsel was ineffective at trial for failing to advise him of the importance of testifying in his own defense and for not "pressing the matter" of the bill of particulars with the trial court. He also argues that counsel was ineffective on appeal for not raising the denial of the bill of particulars and for not including the jury questionnaires in the record.

In denying the petition, the court, among other things, accredited the testimony of trial counsel about the numerous discussions he had with the petitioner with respect to testifying. The court found that the petitioner had not met his burden of demonstrating either a deficiency in counsel's performance or a prejudice to his case based on his allegation that counsel was ineffective with respect to the petitioner's decision about testifying. The court further found that the petitioner failed to show any prejudice with respect to his allegations that counsel did not sufficiently press the issue of the bill of particulars, raise the denial of the bill of particulars as an issue on appeal, or include the jury questionnaires in the record on appeal.

The record fully supports the findings and conclusions of the post-conviction court. We note, first, counsel's testimony at the evidentiary hearing was that he never thought that the petitioner's testimony would be helpful to his defense. As such, counsel cannot be found deficient in his representation for not advising the petitioner to testify. Trial counsel testified that he had numerous conversations with the petitioner about his decision with respect to testifying, discussing with him, among other things, what he thought he would offer to the case in his testimony and the cross-examination he would face if he took the stand. He said that the petitioner was intelligent, engaged, and actively involved in the process and made it clear that his decision was not to testify. The petitioner has not, therefore, shown that counsel provided ineffective assistance with respect to his decision about testifying.

The petitioner has also not shown that counsel provided ineffective assistance by not pressing the matter of the bill of particulars with the trial court or raising it as an issue on direct appeal. At the evidentiary hearing, the petitioner acknowledged that counsel argued for the bill of particulars, but was denied by the trial court. Trial counsel also testified that he filed for and argued strenuously for the bill of particulars, but the trial court denied his motion. We, therefore, fail to see how counsel failed "to press the matter" in the trial court. As for counsel's failure to raise the trial court's denial of his motion as an issue on direct appeal, we note that "[t]he determination of which issues to raise on appeal is generally within

-23-

appellate counsel's sound discretion." <u>Carpenter v. State</u>, 126 S.W.3d 879, 887 (Tenn. 2004). Trial counsel testified that he could not say why he had not raised the issue on appeal, but he believed he was successful at trial in separating the victim's injuries into three different "clusters" and showing how the petitioner was absent from the home during much of the time in which the third cluster of injuries occurred. "[I]neffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." <u>Kennath Henderson v. State</u>, No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *44 (Tenn. Crim. App. June 28, 2005), <u>perm. app. denied</u> (Tenn. Dec. 5, 2005). The petitioner has not, therefore, shown that he was denied the effective assistance of counsel based on counsel's actions or inactions with respect to the bill of particulars.

As for counsel's failure to include the jury questionnaires in the record, counsel acknowledged he was at fault for not doing so and the post-conviction court found him deficient in this regard. The court further found, however, that the petitioner was unable to show that the outcome of his case was prejudiced as a result. We agree. Although we noted in our direct appeal opinion that our ability to review whether the trial court abused its discretion in seating three jurors that the petitioner challenged for cause – a man who was a former Child Protective Services investigator, a woman who disclosed on her questionnaire that she had been sexually abused as a child, and a woman who on her questionnaire expressed her unhappiness at the thought of her tax dollars paying for a public defender or court-appointed lawyer – was "limited" due to the fact that he did not include the jury questionnaires in the appellate record, we went on to review the issue at some length before concluding that the trial court acted within its discretion in allowing the jurors to remain on the jury. <u>Blake Delaney Tallant</u>, 2008 WL 115818, at *18. The petitioner has not, therefore, shown that he was denied the effective assistance of counsel based on counsel's failure to include the jury questionnaires in the record on direct appeal.

## CONCLUSION

Based on our review, we conclude that the petitioner has not met his burden of showing that he was denied the effective assistance of counsel at trial or on appeal. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-24-